# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
**No. 22-1481V**

|  |  |
|---|---|
| TINA JACKSON,<br><br>                 Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                 Respondent. | Chief Special Master Corcoran<br><br><br><br>Filed: June 15, 2026 |

*Isaiah Kalinowski, Bosson Legal Group, Fairfax, VA, for Petitioner.*

*Emilie Williams, U.S. Department of Justice, Washington, DC, for Respondent.*

### FINDINGS OF FACT AND CONCLUSIONS OF LAW[1]

On October 11, 2022, Tina Jackson filed a Petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a right shoulder injury related to vaccine administration ("SIRVA") following her receipt of an influenza ("flu") vaccine on October 11, 2019. ECF No. 1 at 1 ("Petition"). The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters.

For the reasons set for the below, I determine that Petitioner is not entitled to compensation for a SIRVA Vaccine Injury Table claim, because she cannot meet her

---

[1] Because this ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

burden of proof on the onset requirement. Petitioner shall also show cause as to whether she can state a cognizable causation-in-fact/non-Table claim.

## I.      Procedural History

On March 16, 2023, this case was assigned to the SPU. ECF No. 10. Due to administrative delays, Respondent did not state his position disputing entitlement to compensation until June 7, 2024. ECF No. 18, 20. Petitioner thereafter filed additional evidence and medical records.

Respondent filed his Rule 4(c) Report on August 15, 2024. ECF No. 28 ("Rule 4(c) Report"). On October 1, 2024, I ordered the parties to brief the issues raised in the Rule 4(c) Report. ECF No. 31. On November 14, 2024, Petitioner filed a memorandum in support of entitlement.[3] ECF No. 32 ("Pet'r Br."). Respondent filed a response brief on December 27, 2024. ECF No. 33 ("Resp't Br."). Petitioner filed a reply on January 9, 2025. ECF No. 34 ("Pet'r Reply). This matter is ripe for adjudication.

## II.     Relevant Evidence

I have reviewed all of the evidence filed to date. I will only summarize or discuss evidence that directly pertains to the determinations herein, as informed by the parties' respective citations to the record and their arguments.

### A.      Petitioner's Vaccination and Subsequent Unrelated Treatment

Petitioner was 61 years old when she received the flu vaccine on October 11, 2019, at a CVS Pharmacy ("CVS"). Ex. 9 at 2. Petitioner was apparently unable to obtain any signed vaccine administration record and consent form. Instead, CVS Pharmacy provided a list of all vaccinations that Petitioner received between October 1, 2016 and October 17, 2022. Ex. 9 at 2. This document represented that Petitioner received a flu vaccine on October 11, 2019, in her *left* deltoid.

Thereafter, Petitioner was seen numerous times by her treaters for unrelated issues. For example, Petitioner had a mammogram on December 19, 2019. Ex. 10 at 655. On January 9, 2020, Petitioner had an annual gynecological exam. *Id.* at 602. On February 18, 2020, Petitioner established care with a new primary care physician ("PCP) and discussed possible anemia. Ex. 2 at 56. These records (which reflect treatment events occurring somewhat contemporaneously to the October 2019 vaccination) do not contain any indication that Petitioner complained of arm or shoulder pain.

---

[3] Petitioner styled the memorandum as a motion for a ruling on the record, but did not file it as such.

Rather than shoulder issues, Petitioner's major medical concern in 2020-21 was abdominal pain. On May 27, 2020 and October 15, 2020, Petitioner saw her PCP for gastrointestinal discomfort and pain after eating. *Id.* at 51, 54. The complaint of lower left quadrant pain lead to a gynecological workup and CT scan. Ex. 10 at 471. The CT scan revealed uterine fibroids and a left cystic adnexal mass. *Id.* Petitioner was referred for a gynecology-oncology consult and then a hysterectomy and bilateral salpingo-oophorectomy. *See id*. at 38-39*.* Petitioner underwent this surgery on November 25, 2020. *Id.* at 165-66. Fortunately, Petitioner was found only to have a benign hematosalpinx. *Id.* at 94. After her surgery, Petitioner had additional gynecology appointments on November 25, 2020, January 14, 2021, and August 30, 2021.[4] *Id.* at 94, 498, 535. It does not appear that Petitioner mentioned any arm or shoulder pain at these encounters.

Petitioner also saw her PCP for annual check-ups during this time. On February 23, 2021, Petitioner had a routine physical. Ex. 2 at 41. Petitioner did not have any health concerns and had a normal musculoskeletal exam. *Id.* at 41-43. One year later, on February 24, 2022, Petitioner returned to her PCP for her next annual physical. *Id.* at 38. Again, Petitioner did not report any complaints – indeed, Petitioner stated that she had been eating healthy and exercising every day on a new exercise bicycle. *Id.* at 40. Neither of these appointments suggested that Petitioner was suffering from arm or shoulder pain.

### B.    Petitioner's First Complaint of Arm Pain Occurred Two and a Half Years After Vaccination

On April 19, 2022, although she had recently had an annual physical, Petitioner returned to her PCP's office to be "evaluated for *right arm pain* x2 years" that she "thinks was from a flu shot." *Id.* at 35, 37 (emphasis added). Nurse practitioner ("NP") Alexis Hood stated in the relevant record that Petitioner "had a flu shot in 2019 given at CVS and reports that she has had pain in her right arm since then." *Id.* at 37. Petitioner explained that "she never usually gets her injections in her right arm, always in the left without any issue." *Id.* The pain had been constant, but varying in severity, although Petitioner also rated the pain quite severely as 8-10/10. *Id.* According to Petitioner, she had "reported it to her PCP before and was told that she likely tensed up during her injection and that the pain should improve with time, but it hasn't." *Id.* Petitioner was referred to orthopedics for further evaluation. *Id.*

On April 26, 2022, Petitioner met with orthopedist Dr. Brian DeLay for evaluation of right shoulder pain. Ex. 3 at 3. Petitioner stated that she "received a flu shot in 2019

---

[4] Petitioner also saw a gastroenterologist physician's assistant on December 4, 2020. Ex. 2 at 21-22.

[and] lost range of motion." *Id.* She again rated her pain as 8/10. *Id.* Petitioner also stated that her pain had "become slowly worse over the last 3 years." *Id.* Dr. DeLay took x-rays, which revealed narrowing of the inferior glenohumeral joint with cystic degeneration of distal clavicle, suggestive of AC joint osteoarthritis. *Id.* at 4. Dr. DeLay diagnosed Petitioner with rotator cuff syndrome. *Id.* He administered a cortisone injection, prescribed Meloxicam, and referred Petitioner to physical therapy ("PT"). *Id.*

Petitioner did not undertake PT immediately, but returned to Dr. DeLay for a follow up on August 19, 2022. Ex. 13 at 14-16. Petitioner again described that her symptoms "all began with a flu shot in 2019." *Id.* at 14. Petitioner reported that the cortisone injection provided relief for about three months, but complained of side effects from the Meloxicam. *Id.* at 14. Petitioner reported her pain as a 7/10, although Dr. DeLay noted "she may just have pain from the injection into her deltoid." *Id.* Dr. DeLay administered a second steroid injection into the right subacromial bursa and again recommended PT. *Id.* at 16.

On August 19, 2022, Petitioner had a PT evaluation right shoulder pain. Ex. 13 at 9. Petitioner described her pain as starting "after a flu shot" and noted that it "never improved so she finally seeked [sic] help." *Id.* However, Petitioner also described an onset contrary to her previous connection of the pain to the October 11, 2019 flu shot, stating "has had pain *for several months*." *Id.* (emphasis added). Petitioner was assessed with rotator cuff impingement and was recommended to attend weekly PT sessions. *Id.* at 11.

On September 2, 2022, Petitioner had her second PT appointment. *Id.* at 5. She reported being pain-free since her second cortisone injection and rated her pain at 0/10. *Id.* at 6. Petitioner's third and final PT session was on September 12, 2022. *Id.* at 5. Petitioner continued to report that she did not have any pain. *Id.* at 4. Petitioner was discharged on that date with a note that she had met her goals including range of motion ("ROM") to at least 170 degrees, reaching into cabinets, washing her back, dressing, and having undisturbed sleep. *Id.*

### C.    Petitioner's Treatment for Unrelated Issues Through March 2024

Petitioner's remaining medical records addressed unrelated issues. On November 3, 2022, Petitioner was seen by her PCP for symptoms of anxiety and depression. Ex. 15 at 20. She had follow-up appointments to address these symptoms on December 1, 2022, and January 3, 2023. Ex. 15 at 14-19. There were no complaints of shoulder pain documented at these appointments.

On March 8, 2023, Petitioner had her annual physical with her PCP. Ex. 15 at 10. A physical examination showed normal strength and movement in all extremities. *Id.* at

16. Petitioner also reported that she exercised every day on her bicycle. *Id.* at 12. There was no mention of shoulder pain or injury at this appointment.

Further, on December 19, 2023, Petitioner had a gynecology appointment which included a musculoskeletal exam which documented normal ROM. Ex. 14 at 21. On March 12, 2024, Petitioner had her annual physical with her PCP. Ex. 15 at 3-5. Petitioner reported "that physically [] feels okay." *Id.* at 3. Again, Petitioner did not report any arm or shoulder pain.

### D.    Declaration Evidence

Petitioner filed a declaration on January 24, 2023. Ex. 11 at 1. This declaration is highly legalistic in form, and conclusory in nature. *See id.* at 1-2. Petitioner's statement that she "suffered the onset of nagging, persistent pain at the injection site the same day as the vaccination" is the only description of Petitioner's symptoms and their genesis. *Id.* at 1. Petitioner did not provide any explanation for why she waited two and a half years to first report this pain. *See id.* at 1-2. Petitioner also did not discuss the CVS record indicating that she received the vaccine in her left deltoid. *See id.*

Petitioner has also filed a declaration from a co-worker, Na'Tanya Hardin. Ex. 16 at 1. Ms. Hardin "recall[ed] back in October 2019, that around the time of Halloween 2019, [Petitioner] mentioned that she was feeling soreness in her right arm from an influenza vaccine she had received a few weeks earlier." *Id.* at 1. In the "weeks and months that followed," Petitioner often asked Ms. Hardin for help reaching an overhead cabinet at work and told Ms. Hardin about her difficulties at home with daily tasks due to the "pain and limited [ROM] in her right arm." *Id.* Petitioner also "complained daily about the pain, and often massaged her shoulder to try to ease the pain." *Id.* Although Petitioner and Ms. Hardin do not see each other at work anymore due to working from home, Petitioner still informed Ms. Hardin in April 2022 about her treatment, and continued to complain about the pain. *Id.* at 2.

Finally, Petitioner filed a declaration from longtime friend John Lindsey. Ex. 17 at 1. Mr. Lindsey recalled that, "around the end of October 2019" Petitioner expressed that she was having "ongoing pain" since receiving her flu vaccination. *Id.* Mr. Lindsey stated that Petitioner told him that "when the vaccination was administered, it felt more like a jab to her shoulder." *Id.* Petitioner continued to complain of pain and difficulties with household tasks in conversations in the following months. *Id.* Mr. Lindsey asserted that "after the closures occasioned by the [C]ovid 19 pandemic, she finally was seen by an orthopedic doctor, and began physical therapy." *Id.* at 2. However, Petitioner told Mr. Linsdey that the pain had persisted and her ROM had not improved. *Id.*

### III.    Petitioner Has Not Met Her Burden of Proof on the Table Claim

#### A.    Applicable Legal Standards

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Section 11(c)(1). A petitioner may prevail on his claim if he has "sustained, or endured the significant aggravation of any illness, disability, injury, or condition" set forth in the Table. Section 11(c)(1)(C)(i). If a petitioner establishes a Table injury, causation is presumed.

A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. In *Lowrie*, the special master wrote that "written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Id.* at *19. The United States Court of Federal Claims has recognized that "medical records may be incomplete or inaccurate." *Camery v. Sec'y of Health & Human Servs.*, 42 Fed. Cl. 381, 391 (1998). And the Federal Circuit has "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

Medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery*, 42 Fed. Cl. at 391 (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993). The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*

*v. Sec'y of Health & Human Servs*., 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). A Table SIRVA claim requires proof of onset of shoulder pain within 48 hours of vaccination. 42 C.F.R. §§ 100.3(a)(XIV)(B), (c)(10)(ii). The criteria establishing a SIRVA under the accompanying Qualifications and Aids to Interpretation ("QAI") are as follows:

Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g., NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

**B.    Petitioner Has Not Establish Onset Within 48 Hours By Preponderant Evidence**

The evidence does not preponderantly demonstrate that onset of Petitioner's pain likely occurred within 48 hours of vaccination. *See* Pet'r Br. at 8-9. The fact that Petitioner waited two and a half years to report any right shoulder symptoms, with numerous intervening appointments and opportunities to seek treatment for an allegedly persistent medical concern, weighs heavily against finding onset likely occurred within 48-hours of vaccination.

Petitioner's records from her April-September 2022 treatment do very little to counteract this conclusion. Petitioner's statements to her treaters that she had experienced pain since receipt of a flu vaccine in 2019 were vague, lacking in detail, and only superficially suggested that the pain had its onset shortly in time after vaccination. Even more, at the August 19, 2022 PT session, Petitioner stated that the pain had started "after a flu shot," but then endorsed pain "for several months." Ex. 13 at 9. None of these records are particularly good evidence of pain beginning within the required 48 hours.

Petitioner attempts to explain away the delay in reporting pain by arguing that she had previously reported right shoulder pain to her PCP, but was "told that she likely tensed up during her injection and that the pain should improve with time . . . ." *Id.* at 8 (citing Ex. 2 at 37). Petitioner argues (without any factual basis) that this conversation must have occurred in early 2020, perhaps at the February 2020 PCP appointment, but that her doctor, with a "blasé, blaming, and minimizing" attitude, decided that her symptoms were not worth recording in the visit notes. *Id.*; Pet'r Reply at 3. Despite this argument (which reads more like an attorney contention than a witness statement), Petitioner notably did not give more information about this incident in her declaration or provide any date for when it occurred.

It is surely true that Program claimants who have experienced a SIRVA often delay treatment, in the expectation that the issue will resolve on its own over time. But the length of the delay matters -- two and a half years of inaction, with intervening opportunities to seek medical treatment, cannot be ignored. Even putting aside the unrelated gynecological treatment and surgery, it is reasonable to expect that a claimant suffering from constant, severe 8-10/10 pain would obtain medical care much sooner. *See Pitts v. Sec'y of Health & Hum. Servs.*, No. 18-1512V, 2020 WL 2959421, at *5 (Fed. Cl. Spec. Mstr. Apr. 29, 2020)). ("It is reasonable to expect that the average Program claimant might seek medical treatment sooner if in fact the person was experiencing sudden post-vaccination pain.). I also do not find it reasonable to assume that Petitioner would have denied the presence of any musculoskeletal issues at multiple exams, even if she believed that the pain would eventually resolve.

Further, to the extent that Petitioner is arguing, based on Mr. Lindsey's declaration, that she was unable to seek treatment due to the COVID-19 Pandemic, the timing of events does not in this case aid her. *See* Pet'r Br. at 9 (citing Ex. 17 at 2). Petitioner received the vaccine in October 2019, and thus had several months to seek treatment before the COVID-19 Pandemic "officially" began (in March 2020). Petitioner also had appointments with other treaters, including surgery, even during the height of the Pandemic, undermining her argument that it prevented her from obtaining shoulder care. *See* Ex. 2 at 48, 51; Ex. 10 at 38, 165, 471.

I also find the declaration testimony to be unconvincing. Although Petitioner's most precise evidence of onset is found in her declaration statement that she "suffered the onset of nagging, persistent pain at the injection site the same day as the vaccination," Ex. 11 at 1, the Vaccine Act prevents me from finding a petitioner entitled to compensation based upon the petitioner's claims alone. *See* Section 13(a). This statement is also at odds with her failure to seek treatment for more than two and a half years. Claimants cannot use sworn witness statements to ameliorate medical record evidence that reveals no efforts to treat what is subsequently portrayed as a consistent, post-vaccination medical issue.

Additionally, Ms. Hardin's statement that Petitioner first mentioned soreness in her arm from the flu vaccine "around the time of Halloween," is not supportive of a 48-onset, given that the vaccination occurred three weeks earlier. Ex. 16 at 1. Similarly, Mr. Lindsey recalled that "around the end of October 2019," Petitioner expressed that she was experiencing ongoing pain in her right arm since having received the vaccine. Ex. 17 at 1. These statements were made more than four years after the vaccination and lack precision as to time and place. I therefore give them little weight.

As Respondent argues, the two and a half year delay here is well beyond the length of delay in other cases that was found to be incompatible with a 48-hour onset. *See* Resp't Br. at 2 (citing *Bell v. Sec'y of Health & Hum. Servs.*, No. 19-0952V, 2023 WL 6620363 (Fed. Cl. Spec. Mstr. July 12, 2023); *Rose v. Sec'y of Health & Hum. Servs.*, No. 20-0056V, 2022 WL 4128908 (Fed. Cl. Spec. Mstr. Aug. 10, 2022); *Bulman v. Sec'y of Health & Hum. Servs.*, 19-1217V, 2021 WL 4165349 (Fed. Cl. Spec. Mstr. Aug. 12, 2021); *Pitts*, 2020 WL 2959421, at *5). Petitioner's only response is that "the issues in this case are primarily factual," and there is thus "no legal basis to make factual determinations based on some kind of overriding presumption implied by the factual findings made in other cases." Pet'r Reply at 4. However, I do not consider Respondent's citations with a view to imposing any "overriding presumption," but instead recognize that prior decisions assist in determining the outer limits of the onset requirement.

Finally, Petitioner relies on the general principles from *Kirby* that it is incorrect to presume "that medical records are accurate and complete as to all the patient's physical conditions," and that "the absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstances." Pet'r Br. at 2-5 (citing 997 F.3d at 1383); Pet'r Reply at 3-4. This argument is unpersuasive because Petitioner's medical records *affirmatively* set forth what concerns Petitioner did raise at those treatment events. Further, even if the absence of a mention of right shoulder pain does not negate its existence, there is nothing in these records allowing me to draw the conclusion that any such pain *likely* began within 48-hours of vaccination. The totality of evidence weighs against a favorable onset finding.

## C.    Petitioner Has Not Established Situs With Preponderant Evidence

Respondent has also questioned whether Petitioner's pain was limited to the shoulder in which the vaccination was administered. Rule 4(c) Report at 7; Resp't Br. at 3. It is incontrovertible that Petitioner's only proof of vaccination identifies that she received the flu vaccine at issue in her left deltoid. *See* Ex. 9 at 2.

Petitioner's response is to assert that the CVS record must be inaccurate. Pet'r Br. at 9; Pet'r Reply at 4. But this argument is not persuasive for several reasons. First, even if the CVS list was not created contemporaneously with the date of vaccination, as Petitioner asserts, she still has not presented any evidence of the kind that would outweigh it. No contemporaneous records (meaning even within six months of vaccination) describe right-sided shoulder pain. This is not a case in which the vaccination record is a clear outlier among a large amount of timely and specific descriptions of pain in the opposite shoulder made by a petitioner to his treaters. All of Petitioner's descriptions of a right shoulder injury were also made two and a half years after vaccination. *See* Ex. 2 at 9, 37; Ex. 13 at 8. And Petitioner has not provided any first-hand details in her testimony, such as a recollection of how she was positioned, or why she chose to receive the vaccine in her right arm when she normally used the left arm, that would support her claim.

Second, I cannot simply assume, as Petitioner urges, that the CVS record is in error because it was produced from an electronic database or was generated from drop-down menus. *See* Pet'r Br. at 9. That kind of assumption generally merits probative weight only when a collection of subsequent medical records suggest a situs consistent with a claimant's contentions. As proof of overall lack of attention to accuracy at this CVS location, Petitioner focuses on a clerical error made by CVS in producing records from a different individual with the same name. *Id.* (citing Ex. 1 at 1-9). However, such an error

10

in record-keeping does not at all speak to the accuracy of the administrator who filled in the situs information for the October 11, 2019 vaccination.

Third, Petitioner's testimony and that of her friend and co-worker does not outweigh the CVS record. *See* Pet'r Br. at 9. Neither of those individuals were present when Petitioner received the vaccine, and thus their testimony that she complained of right shoulder pain later does not address the actual question of situs. Petitioner did not provide any particulars about the vaccination that would allow an inference that the administrator may not have accurately recorded situs. Further, although Petitioner also argues in reply that she "made earnest efforts to correct the record," this is not described in her declaration or evinced in any additional record. *See* Pet'r Reply at 4-5.

Overall, despite the limitations of the CVS record, the totality of the evidence in favor of a right shoulder administration is still not sufficient to meet Petitioner's burden of proof. Petitioner's claim could be dismissed on this issue alone (and even if it could be decided in Petitioner's favor, onset is more clearly not established in this case).

## IV.    Petitioner Shall Show Cause Why a Causation-in-Fact Claim Should Not Be Dismissed

In previous cases dismissing Table claims, I have often found that a petitioner may still have a potential causation-in-fact injury claim that should be transferred out of SPU for further proceedings. However, although Petitioner has plead that the vaccination she received "actually caused, or, alternatively, significantly aggravated, the injuries complained of," Petition at ¶ 26, I find it highly doubtful that Petitioner would be able to satisfy the three *Althen* prongs for a causation-in-fact claim. *See Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274, 1279-80 (Fed. Cir. 2005). In particular, *Althen* requires that a petitioner

> show by preponderant evidence that the vaccination brought about her injury by providing: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury.

*Id.*

Here, the situs deficiency and the lengthy delay between the vaccination and Petitioner's first report of right shoulder pain suggest serious problems with all three factors. Petitioner would be required to demonstrate by preponderant evidence that a left

11

shoulder vaccination caused an injury to her right arm and that the symptoms did not immediately manifest. Therefore, as stated below, Petitioner shall show cause why this claim should not also be dismissed.

**Conclusion**

**Petitioner's Table claim is dismissed. Petitioner is ORDERED to Show Cause why the causation-in-fact claim should not also be dismissed. Petitioner shall comply with this order by August 12, 2026.[5] Petitioner may consult with an expert, but should not at this time file an expert report. Respondent may file a response within 30 days thereafter and Petitioner may file any reply within 15 days after that.**

**IT IS SO ORDERED.**

s/Brian H. Corcoran<br>
Brian H. Corcoran<br>
Chief Special Master

---

[5] Alternatively, if Petitioner wishes to exit the Vaccine Program, counsel shall file the appropriate motion, Stipulation, or Notice. *See* https://www.uscfc.uscourts.gov/sites/default/files/Guidance %20on%20Exiting%20the%20Vaccine%20Program.pdf.